Sidney H. Asch, J.
This proceeding concerns Eugene Weber-list, a mentally retarded resident of Manhattan Developmental Services (“ MDS ”). A petition has been filed by the director of MDS requesting an order to show cause why MD.S should not arrange for treatment and surgery for Eugene.
Eugene Weberlist was bom January 18, 1952 at Lenox Hill Hospital. His twin died within 44 minutes of birth, and his parents were advised that he would probably also die soon ■thereafter. Eugene was born hydrocephalic, with a cleft palate and webbed fingers and toes. He remained at Lenox Hill Hospital but did not die. After eight and one-half months, the hospital requested his discharge.
His parents, Eugene and Grace Harley Weberlist, had one normal child at home who had already been told that Eugene had died. Therefore, the parents requested an alternative and placement at Willowbrook State School which was arranged on March 26, 1953, through court certification. His parents remained in contact with Willowbrook though they did not visit him. In 1967, and again in 1968, his mother was contacted and paid for special .shoes that Eugene needed. Letters sent to the family in 1969 were returned “ addressee unknown ”. In 1970, patient resources tried to locate the family but were unable to do so. No further contact with the family, has been made and their whereabouts are considered unknown.
On October 4,1973, Eugene was transferred to MDS and was admitted upon a nonobjecting application signed by the director of the institution.
Eugene’s condition was diagnosed as severe mental retardation associated with diseases and conditions due to unknown prenatal influence, hydrocepharus, congenital, Binet IQ approximately 20. He is unable to speak, but he does make sounds similar to words .such as “ yes ” and “no ”. He is well-behaved, co-operative and understands simple commands which he is able to follow. He has most self-help skills and is able to function in his apartment within the institution. However, he is very ■shy and tends to .stay alone, which may be a reaction to his physical appearance. Eugene does not have the ability to understand and would not be able to consent to the treatment and surgery.
Proposed treatments would include dental work and hand surgery, surgery for the cleft palate and jaw, and intracranial surgery for facial restoration.
At a conference at New York University School of Medicine on January 14,1974, attended by a representative of the Mental Health Information Service, the Plastic Surgery Unit stated *755 that such .surgery was feasible, necessary and could be beneficial. It was noted that without such surgery Eugene would remain in an institution for his entire life. However, with this surgery, he would have the potential to be educable or at least trainable and, with a changed appearance, possess the ability to live a more normal life outside of an institution. A discussion of the risks involved indicated that they were very low. Possible advantages highly outweighed any small risks involved.
In reviewing the records and the proposed procedures, the Mental Health Information Service found no reason to object to a Judge’s order permitting the requested treatment and surgery.
A guardian ad litem has been appointed, since no person with a close family relationship could be located to consent to the proposed surgery. The guardian ad litem visited Eugene at MD,S. He met also with the physician in charge of Eugene. The guardian ad litem observed his ward and confirmed that the latter appeared to be suffering from the various physical conditions already discussed. The guardian recommended that the court authorize the performance of the surgery requested in the petition with the condition, however, that following each surgical procedure, an opportunity be given to the Mental Health Information Service of the First Department to determine whether the patient has responded to the surgery and is physically able to withstand the next procedure to be undertaken.
If this were an emergency life-saving situation, it would be unnecessary to entertain the petition since the hospital could take the full responsibility for the course of treatment necessary under the circumstances without need for judicial authority. (See Matter of Nemser, 51 Misc 2d 615, 622; Matter of President and Directors of Georgetown Col., 331 F. 2d 1000.) But this is not such a case. It cannot be found by this court that such surgery is of an emergency nature or necessary to save Eugene’s life. The affidavit of Dr. J. M. Converse in support of the petition does nothing more than claim that the projected treatment and surgery “ may in due time enable him to contribute his part for earning a living instead of remaining all his life in custodial care ”.
Under its police powers, a State may exert its coercive force on an individual if he represents a significant danger .to other persons or to society. The authority of the State to dictate compulsory medical procedures, however, is usually sanctioned by the doctrine of parens patriae, rather than its police power (Jacobson v. Massachusetts, 197 U. S. 11; see, also, Prince v. Commonwealth, 321 U. S. 158, 166-167; Hershey, Compulsory *756 Personal Health Measure Legislation, 84 Pub. Health Reps., 341-352). The rationale of parens patriae is that the State must intervene in order to protect an individual who is not able to make decisions in Ms own best interest. The decision to exercise the power of parens patriae must reflect the welfare of society, as a whole, but .mainly it must balance the individual’s right to be free from interference against the individual’s need to be treated, if treatment would in fact be in his best interest. Because of the variables, the question of whether this power should be exercised in a given situation is quite difficult. (See Cudy v. State, 237 Ark. 927; Mannus v. State ex rel. Dewitt School, 240 Ark. 42; Note, Compulsory Medical Treatment and the Free Exercise of Religion, 42 Ind. L. J. 386; John and Peterson, Legal Status of Christian Science Treatment, 10 Med. Trial Tech. Q. 13; How, Religion, Medicine and Law, 3 Can. B. J. 365; Note, Compulsory Medical Treatment: The State’s Interest Re-Evaluated, 51 Minn. L. Rev: 293.)
“ The issue * * * is whether it is justifiable, and under what circumstances, to radically alter the nature of1 the individual.” (P. London, The Hastings Center Report, May, 1973, p. 9.) Courts have been reluctant to authorize surgical intervention in a “ nonemergency ” situation where the individual is under a disability. (Matter of Seiferth, 309 N. Y. 80; Matter of Tuttendario, 21 Pa. Dist. R. 561; Matter of Hudson, 13 Wn. 2d 673; Matter of Green, 452 Pa. 373; Matter of Sampson, 65 Misc 2d 658, affd. 37 A D 2d 668, affd. Per Curiam, 29 NY 2d 900; Matter of Rotkowitz, 175 Misc. 948, 950; Matter of Arlene D., 70 Misc 2d 953; Matter of Commissioner of Social Servs., 72 Misc 2d 428; State v. Perricone, 37 N. J. 463; Matter of Carstairs, 115 N. Y. S. 2d 314; Ann., 30 ALR 2d Infant — Compulsory Medical Care, p. 1138; Note, Court Ordered Non-Emergency Medical Care for Infants, 18 Cleve.-Mar. L. Rev. 296; Zaroemski, Blood Transfusions and Elective Surgery, 23 Cleve. St. L. Rev., p. 231.)
The court is faced with the possibility that the ward may simply serve as an object for experimentation. Organized concern with the threat of human experimentation can be dated back to the so-called Nuremberg Code of 1946. (See, e.g., Symposium on Ethical Aspects of Experimentation with Human Subjects, 98 Daedalus 219 et seep; Freund, Ethical Problems in Human Experimentation, 273 New Engl. J. Med. 687; Curran & Beecher, Experimentation in Children, 10 J. A. M. A. 77; Lasagna, Special Subjects in Human Experimentation, 98 Daedalus 449; Note, Experimentation on Human Beings, 20 Stan. L. Rev. 99 ; *757 Rules and Regulations of the U. S. Dept, of Health, Education and Welfare in the Protection of Human Subjects, eff. July 1, 1974.) It may well be that: “Human experimentation has been a part of medical science since it gained the title of ‘ science ’ some centuries ago. There are still physicians who insist that all medical treatment is still experimental.’ ’ (Curran and Shapiro, Law, Medicine and Forensic .Science [2d. ed., 1970], p. 887) but the critical factor in this case is its beneficial potential for Eugene Weberlist.
There is a strident cry in America to terminate the lives of other people — deemed physically or mentally defective. (See, e.g., Panel Told Defective Infants Are Allowed to Die, N. Y. Times, June 12,1974; Doctors Views on Euthanesia, N. Y. Times, June 16,1974, p. E7; serious Infant Deformity Seen as Justifying Death, N. Y. Times, July 8, 1974, p. 32.) Assuredly one test of a civilization is its concern with the survival of the “ unfittest ”, a reversal of Darwin’s formulation. (See, also, Grunberg, Who Lives and Dies!, N. Y. Times, April 22, 1974, p. 35.)
Ordinarily, this court would be constrained to follow the philosophy expressed by Mr. Justice Brandéis in Olmstead v. United States (277 U. S. 438, 478): “ The makers of our Constitution * * * sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred as against the Government the right to be left alone — the most comprehensive of rights and the most valued by civilized man.”
In this case, the court must decide what its ward would choose, if he were in a position to make a sound judgment. Certainly, he would pick the chance for a fuller participation in life rather than a rejection of his potential as a more fully endowed human being. The court does not know what the future holds in store for its unfortunate ward — whether the treatment will be successful. But the most humble .of us is entitled to the promise of the Declaration of Independence for 11 life, liberty, and the pursuit of happiness ”. We owe the respondent that opportunity and accordingly, the court authorizes the proposed medical intervention.