SUPERINTENDENT OF BELCHERTOWN STATE SCHOOL
& another *vs.* JOSEPH SAIKEWICZ.

Hampshire.    July 2, 1976. — November 28, 1977.

Present: HENNESSEY, C.J., BRAUCHER, KAPLAN, WILKINS, & LIACOS, JJ.

*Constitutional Law,* Right to refuse medical treatment. *Incompetent Person,* Consent to medical treatment, Right to refuse medical treatment. *Probate Court,* Incompetent person.

Both the doctrine of informed consent and the constitutional right of privacy protect the right of a patient to refuse medical treatment in appropriate circumstances; in the case of an incompetent patient, the right may be asserted by a guardian. [737-740]
Identification of State interests which are to be weighed against a patient's right to refuse medical treatment. [740-744]
A probate judge's decision that radical chemotherapy should not be administered to a sixty-seven year old severely retarded man suffering from cancer was consistent with a proper balancing of applicable State and individual interests. [744-745]
The right to refuse medical treatment in appropriate circumstances extends to incompetent persons. [745-746]
A decision whether to withhold medical treatment from a mentally incompetent person should conform as closely as possible to the decision which would be made by the incompetent person, if that person were competent, but taking into account his present and future incompetency as one of the factors which would necessarily enter into the decision-making process. [746-747]
A probate judge's decision that chemotherapy should not be administered to a sixty-seven year old severely retarded man suffering from cancer was based on a regard for his actual interests and preferences and was supported by the evidence. [752-755]
A Probate Court is the appropriate forum for determining whether potentially life-prolonging treatment should be withheld from a person incapable of making his decision. [755-757]
Outline of appropriate procedures for determining whether life-prolonging medical treatment should be given to or withheld from a terminally-ill incompetent person. [757-759]

PETITION for guardianship filed in the Probate Court for the county of Hampshire on April 26, 1976.

The case was reported to the Appeals Court by *Jekanowski,* J. The Supreme Judicial Court granted a request for direct review.

The case was submitted on briefs.

*Robert M. Bonin,* First Assistant Attorney General, *Stephen Schulz,* Assistant Attorney General, *Paul R. Rogers,* Special Assistant Attorney General, *Judith Applebaum & William Swartz,* for the plaintiffs.

*Patrick J. Melnik,* guardian ad litem, for the defendant.

*Jonathan Brant, L. Scott Harshbarger & Robert H. Bohn, Jr.,* Assistant Attorneys General, for Civil Rights and Liberties Division of the Department of the Attorney General, amicus curiae.

*William J. O'Neil,* for the Mental Health Legal Advisors Committee, amicus curiae.

*John C. Vincent, Jr.,* for Massachusetts Association for Retarded Citizens, Inc., amicus curiae.

*Robert L. Burgdorf, Jr., David M. Simonson, Nancy B. Shuger & Frank Laski,* for Developmental Disabilities Law Project of the University of Maryland Law School, amicus curiae.

LIACOS, J. On April 26, 1976, William E. Jones, superintendent of the Belchertown State School (a facility of the Massachusetts Department of Mental Health), and Paul R. Rogers, a staff attorney at the school, petitioned the Probate Court for Hampshire County for the appointment of a guardian of Joseph Saikewicz, a resident of the State school. Simultaneously they filed a motion for the immediate appointment of a guardian ad litem, with authority to make the necessary decisions concerning the care and treatment of Saikewicz, who was suffering with acute myeloblastic monocytic leukemia. The petition alleged that Saikewicz was a mentally retarded person in urgent need of medical treatment and that he was a person with disability incapable of giving informed consent for such treatment.

On May 5, 1976, the probate judge appointed a guardian ad litem. On May 6, 1976, the guardian ad litem filed a report with the court. The guardian ad litem's report indicated that Saikewicz's illness was an incurable one, and that although chemotherapy was the medically indicated

course of treatment it would cause Saikewicz significant adverse side effects and discomfort. The guardian ad litem concluded that these factors, as well as the inability of the ward to understand the treatment to which he would be subjected and the fear and pain he would suffer as a result, outweighed the limited prospect of any benefit from such treatment, namely, the possibility of some uncertain but limited extension of life. He therefore recommended "that not treating Mr. Saikewicz would be in his best interests."

A hearing on the report was held on May 13, 1976. Present were the petitioners and the guardian ad litem.[1] The record before us does not indicate whether a guardian for Saikewicz was ever appointed. After hearing the evidence, the judge entered findings of fact and an order that in essence agreed with the recommendation of the guardian ad litem. The decision of the judge appears to be based in part on the testimony of Saikewicz's two attending physicians who recommended against chemotherapy. The judge then reported to the Appeals Court the two questions set forth in the margin.[2] An application for direct appellate review was allowed by this court. On July 9, 1976, this court issued an order answering the questions reported in the affirmative with the notation "rescript and opinion . . . will follow."[3] We now issue that opinion.

---

[1] In addition to the report of the guardian ad litem, the probate judge had before him the clinical team reports of a physician, a psychologist, and a social worker, as required by G. L. c. 201, § 6A. Expert testimony was taken from a staff physician of the Belchertown State School and two consulting physicians from the Baystate Medical Center, formerly Springfield Hospital.

[2] "(1) Does the Probate Court under its general or any special jurisdiction have the authority to order, in circumstances it deems appropriate, the withholding of medical treatment from a person even though such withholding of treatment might contribute to a shortening of the life of such person?

"(2) On the facts reported in this case, is the Court correct in ordering that no treatment be administered to said JOSEPH SAIKEWICZ now or at any time for his condition of acute myeloblastic monocetic leukemia except by further order of the Court?"

[3] After briefly reviewing the facts of the case, we stated in that order: "Upon consideration, based upon the findings of the probate judge,

## I.

The judge below found that Joseph Saikewicz, at the time the matter arose, was sixty-seven years old, with an I.Q. of ten and a mental age of approximately two years and eight months. He was profoundly mentally retarded. The record discloses that, apart from his leukemic condition, Saikewicz enjoyed generally good health. He was physically strong and well built, nutritionally nourished, and ambulatory. He was not, however, able to communicate verbally — resorting to gestures and grunts to make his wishes known to others and responding only to gestures or physical contacts. In the course of treatment for various medical conditions arising during Saikewicz's residency at the school, he had been unable to respond intelligibly to inquiries such as whether he was experiencing pain. It was the opinion of a consulting psychologist, not contested by the other experts relied on by the judge below, that Saikewicz was not aware of dangers and was disoriented outside his immediate environment. As a result of his condition, Saikewicz had lived in State institutions since 1923 and had resided at the Belchertown State School since 1928. Two of his sisters, the only members of his family who could be located, were notified of his condition and of the hearing, but they preferred not to attend or otherwise become involved.

On April 19, 1976, Saikewicz was diagnosed as suffering from acute myeloblastic monocytic leukemia. Leukemia is a disease of the blood. It arises when organs of the body produce an excessive number of white blood cells as well as other abnormal cellular structures, in particular undeveloped and immature white cells. Along with these symptoms in the composition of the blood the disease is accompanied by enlargement of the organs which produce the cells, e.g.,

we answer the first question in the affirmative, and a majority of the Court answer the second question in the affirmative. However, we emphasize that upon receiving evidence of a significant change either in the medical condition of Saikewicz or in the medical treatment available to him for successful treatment of his condition, the probate judge may issue a further order."

the spleen, lymph glands, and bone marrow. The disease tends to cause internal bleeding and weakness, and, in the acute form, severe anemia and high susceptibility to infection. Attorneys' Dictionary of Medicine L-37-38 (1977). The particular form of the disease present in this case, acute myeloblastic monocytic leukemia is so defined because the particular cells which increase are the myeloblasts, the youngest form of a cell which at maturity is known as the granulocytes. *Id.* at M-138. The disease is invariably fatal.

Chemotherapy, as was testified to at the hearing in the Probate Court, involves the administration of drugs over several weeks, the purpose of which is to kill the leukemia cells. This treatment unfortunately affects normal cells as well. One expert testified that the end result, in effect, is to destroy the living vitality of the bone marrow. Because of this effect, the patient becomes very anemic and may bleed or suffer infections — a condition which requires a number of blood transfusions. In this sense, the patient immediately becomes much "sicker" with the commencement of chemotherapy, and there is a possibility that infections during the initial period of severe anemia will prove fatal. Moreover, while most patients survive chemotherapy, remission of the leukemia is achieved in only thirty to fifty per cent of the cases. Remission is meant here as a temporary return to normal as measured by clinical and laboratory means. If remission does occur, it typically lasts for between two and thirteen months although longer periods of remission are possible. Estimates of the effectiveness of chemotherapy are complicated in cases, such as the one presented here, in which the patient's age becomes a factor. According to the medical testimony before the court below, persons over age sixty have more difficulty tolerating chemotherapy and the treatment is likely to be less successful than in younger patients.[4]

---

[4] On appeal, the petitioners have collected in their brief a number of recent empirical studies which cast doubt on the view that patients over sixty are less successfully treated by chemotherapy. E.g., Bloomfield & Theologides, Acute Granulocytic Leukemia in Elderly Patients,

This prognosis may be compared with the doctors' estimates that, left untreated, a patient in Saikewicz's condition would live for a matter of weeks or, perhaps, several months. According to the testimony, a decision to allow the disease to run its natural course would not result in pain for the patient, and death would probably come without discomfort.

An important facet of the chemotherapy process, to which the judge below directed careful attention, is the problem of serious adverse side effects caused by the treating drugs. Among these side effects are severe nausea, bladder irritation, numbness and tingling of the extremities, and loss of hair. The bladder irritation can be avoided, however, if the patient drinks fluids, and the nausea can be treated by drugs. It was the opinion of the guardian ad litem, as well as the doctors who testified before the probate judge, that most people elect to suffer the side effects of chemotherapy rather than to allow their leukemia to run its natural course.

Drawing on the evidence before him including the testimony of the medical experts, and the report of the guardian ad litem, the probate judge issued detailed findings with regard to the costs and benefits of allowing Saikewicz to undergo chemotherapy. The judge's findings are reproduced in part here because of the importance of clearly delimiting the issues presented in this case. The judge below found:

"5. That the majority of persons suffering from leuke-

226 J.A.M.A. 1190, 1192 (1973); Grann & others, The Therapy of Acute Granulocytic Leukemia in Patients More Than Fifty Years Old, 80 Annals Internal Med. 15, 16 (1974). (Acute myeloblastic monocytic leukemia is a subcategory of acute granulocytic leukemia.) Other experts maintain that older patients have lower remission rates and are more vulnerable to the toxic effects of the administered drugs. E.g., Crosby, Grounds for Optimism in Treating Acute Granulocytic Leukemia, 134 Archives Internal Med. 177 (1974). None of these authorities was brought to the consideration of the probate judge. We accept the judge's conclusion, based on the expert testimony before him and in accordance with substantial medical evidence, that the patient's age weighed against the successful administration of chemotherapy. See note 17 infra.

mia who are faced with a choice of receiving or foregoing such chemotherapy, and who are able to make an informed judgment thereon, choose to receive treatment in spite of its toxic side effects and risks of failure.

"6. That such toxic side effects of chemotherapy include pain and discomfort, depressed bone marrow, pronounced anemia, increased chance of infection, possible bladder irritation, and possible loss of hair.

"7. That administration of such chemotherapy requires cooperation from the patient over several weeks of time, which cooperation said JOSEPH SAIKEWICZ is unable to give due to his profound retardation.[5]

"8. That, considering the age and general state of health of said JOSEPH SAIKEWICZ, there is only a 30-40 percent chance that chemotherapy will produce a remission of said leukemia, which remission would probably be for a period of time of from 2 to 13 months, but that said chemotherapy will certainly not completely cure such leukemia.

"9. That if such chemotherapy is to be administered at all, it should be administered immediately, inasmuch as the risks involved will increase and the chances of successfully bringing about remission will decrease as time goes by.

"10. That, at present, said JOSEPH SAIKEWICZ's leukemia condition is stable and is not deteriorating.

"11. That said JOSEPH SAIKEWICZ is not now in pain and will probably die within a matter of weeks or months a relatively painless death due to the leukemia unless other factors should intervene to themselves cause death.

---

[5] There was testimony as to the importance of having the full cooperation of the patient during the initial weeks of the chemotherapy process as well as during follow-up visits. For example, the evidence was that it would be necessary to administer drugs intravenously for extended periods of time — twelve or twenty-four hours a day for up to five days. The inability of Saikewicz to comprehend the purpose of the treatment, combined with his physical strength, led the doctors to testify that Saikewicz would probably have to be restrained to prevent him from tampering with the intravenous devices. Such forcible restraint could, in addition to increasing the patient's discomfort, lead to complications such as pneumonia.

"12. That it is impossible to predict how long said JOSEPH SAIKEWICZ will probably live without chemotherapy or how long he will probably live with chemotherapy, but it is to a very high degree medically likely that he will die sooner without treatment than with it."

Balancing these various factors, the judge concluded that the following considerations weighed *against* administering chemotherapy to Saikewicz: "(1) his age, (2) his inability to cooperate with the treatment, (3) probable adverse side effects of treatment, (4) low chance of producing remission, (5) the certainty that treatment will cause immediate suffering, and (6) the quality of life possible for him even if the treatment does bring about remission."

The following considerations were determined to weigh in *favor* of chemotherapy: "(1) the chance that his life may be lengthened thereby, and (2) the fact that most people in his situation when given a chance to do so elect to take the gamble of treatment."

Concluding that, in this case, the negative factors of treatment exceeded the benefits, the probate judge ordered on May 13, 1976, that no treatment be administered to Saikewicz for his condition of acute myeloblastic monocytic leukemia except by further order of the court. The judge further ordered that all reasonable and necessary supportive measures be taken, medical or otherwise, to safeguard the well-being of Saikewicz in all other respects and to reduce as far as possible any suffering or discomfort which he might experience.

It is within this factual context that we issued our order of July 9, 1976.

Saikewicz died on September 4, 1976, at the Belchertown State School hospital. Death was due to bronchial pneumonia, a complication of the leukemia. Saikewicz died without pain or discomfort.[6]

---

[6] This information comes to us from the supplemental briefs of the parties.

## II.

We recognize at the outset that this case presents novel issues of fundamental importance that should not be resolved by mechanical reliance on legal doctrine. Our task of establishing a framework in the law on which the activities of health care personnel and other persons can find support is furthered by seeking the collective guidance of those in health care, moral ethics, philosophy, and other disciplines. Our attempt to bring such insights to bear in the legal context has been advanced by the diligent efforts of the guardian ad litem and the probate judge, as well as the excellent briefs of the parties and amici curiae.[7] As thus illuminated, the principal areas of determination are:

A. The nature of the right of any person, competent or incompetent, to decline potentially life-prolonging treatment.

B. The legal standards that control the course of decision whether or not potentially life-prolonging, but not life-saving, treatment should be administered to a person who is not competent to make the choice.

C. The procedures that must be followed in arriving at that decision.

For reasons we develop in the body of this opinion, it becomes apparent that the questions to be discussed in the first two areas are closely interrelated. We take the view that the substantive rights of the competent and the incompetent person are the same in regard to the right to decline potentially life-prolonging treatment. The factors which distinguish the two types of persons are found only in the area of how the State should approach the preservation and implementation of the rights of an incompetent

---

[7] Submitting the brief for the defendant was the guardian ad litem, Patrick J. Melnik. The Attorney General submitted the brief for the plaintiffs. The Civil Rights and Liberties Division of the Department of the Attorney General prepared a brief amicus curiae on behalf of the defendant. Briefs amicus curiae were also submitted by the Mental Health Legal Advisors Committee, the Massachusetts Association for Retarded Citizens, Inc., and the Developmental Disabilities Law Project of the University of Maryland Law School.

person and in the procedures necessary to that process of preservation and implementation. We treat the matter in the sequence above stated because we think it helpful to set forth our views on (A) what the rights of all persons in this area are and (B) the issue of how an incompetent person is to be afforded the status in law of a competent person with respect to such rights. Only then can we proceed to (C) the particular procedures to be followed to ensure the rights of the incompetent person.

## A.

1. It has been said that "[t]he law always lags behind the most advanced thinking in every area. It must wait until the theologians and the moral leaders and events have created some common ground, some consensus." Burger, The Law and Medical Advances, 67 Annals Internal Med. Supp. 7, 15, 17 (1967), quoted in Elkinton, The Dying Patient, the Doctor, and the Law, 13 Vill. L. Rev. 740 (1968). We therefore think it advisable to consider the framework of medical ethics which influences a doctor's decision as to how to deal with the terminally ill patient. While these considerations are not controlling, they ought to be considered for the insights they give us.

Advances in medical science have given doctors greater control over the time and nature of death. Chemotherapy is, as evident from our previous discussion, one of these advances. Prior to the development of such new techniques the physician perceived his duty as that of making every conceivable effort to prolong life. On the other hand, the context in which such an ethos prevailed did not provide the range of options available to the physician today in terms of taking steps to postpone death irrespective of the effect on the patient. With the development of the new techniques, serious questions as to what may constitute acting in the best interests of the patient have arisen.

The nature of the choice has become more difficult because physicians have begun to realize that in many cases the effect of using extraordinary measures to prolong life is to "only prolong suffering, isolate the family from their

loved one at a time when they may be close at hand or result in economic ruin for the family." Lewis, Machine Medicine and Its Relation to the Fatally Ill, 206 J.A.M.A. 387 (1968).

Recognition of these factors led the Supreme Court of New Jersey to observe "that physicians distinguish between curing the ill and comforting and easing the dying; that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refused to treat the hopeless and dying as if they were curable." *In re Quinlan,* 70 N.J. 10, 47 (1976).

The essence of this distinction in defining the medical role is to draw the sometimes subtle distinction between those situations in which the withholding of extraordinary measures may be viewed as allowing the disease to take its natural course and those in which the same actions may be deemed to have been the cause of death. See Elkinton, *supra* at 743. Recent literature suggests that health care institutions are drawing such a distinction, at least with regard to respecting the decision of competent patients to refuse such measures. Rabkin, Gillerman & Rice, Orders Not to Resuscitate, 293 N.E.J. of Med. 364 (1976). Cf. Beecher, Ethical Problems Created by the Hopelessly Unconscious Patient, 278 N.E.J. of Med. 1425 (1968).

The current state of medical ethics in this area is expressed by one commentator who states that: "we should not use *extraordinary* means of prolonging life or its semblance when, after careful consideration, consultation and the application of the most well conceived therapy it becomes apparent that there is no hope for the recovery of the patient. Recovery should not be defined simply as the ability to remain alive; it should mean life without intolerable suffering." Lewis, *supra.* See Collins, Limits of Medical Responsibility in Prolonging Life, 206 J.A.M.A. 389 (1968); Williamson, Life or Death — Whose Decision? 197 J.A.M.A. 793 (1966).

Our decision in this case is consistent with the current medical ethos in this area.

2. There is implicit recognition in the law of the Com-

monwealth, as elsewhere, that a person has a strong interest in being free from nonconsensual invasion of his bodily integrity. *Thibault* v. *Lalumiere,* 318 Mass. 72 (1945). *Commonwealth* v. *Clark,* 2 Met. 23 (1840). *Union Pac. Ry.* v. *Botsford,* 141 U.S. 250, 251 (1891). In short, the law recognizes the individual interest in preserving "the inviolability of his person." *Pratt* v. *Davis,* 118 Ill. App. 161, 166 (1905), aff'd, 224 Ill. 300 (1906). One means by which the law has developed in a manner consistent with the protection of this interest is through the development of the doctrine of informed consent. While the doctrine to the extent it may justify recovery in tort for the breach of a physician's duty has not been formally recognized by this court, *Schroeder* v. *Lawrence,* 372 Mass. 1 (1977); see *Baird* v. *Attorney Gen.,* 371 Mass. 741 (1977); *Reddington* v. *Clayman,* 334 Mass. 244 (1956); G. L. c. 112, § 12F, it is one of widespread recognition. Capron, Informed Consent in Catastrophic Disease Research and Treatment, 123 U. Pa. L. Rev. 340, 365 (1975); Cantor, A Patient's Decision to Decline Life-Saving Medical Treatment: Bodily Integrity Versus the Preservation of Life, 26 Rutgers L. Rev. 228, 236-238 (1973). W. Prosser, Torts § 18 (4th ed. 1971). As previously suggested, one of the foundations of the doctrine is that it protects the patient's status as a human being. Capron, *supra* at 366-367.

Of even broader import, but arising from the same regard for human dignity and self-determination, is the unwritten constitutional right of privacy found in the penumbra of specific guaranties of the Bill of Rights. *Griswold* v. *Connecticut,* 381 U.S. 479, 484 (1965). As this constitutional guaranty reaches out to protect the freedom of a woman to terminate pregnancy under certain conditions, *Roe* v. *Wade,* 410 U.S. 113, 153 (1973), so it encompasses the right of a patient to preserve his or her right to privacy against unwanted infringements of bodily integrity in appropriate circumstances. *In re Quinlan, supra* at 38-39. In the case of a person incompetent to assert this constitutional right of privacy, it may be asserted by that person's guardian in conformance with the standards and proce-

dures set forth in sections II (B) and II (C) of this opinion. See *Quinlan* at 39.

3. The question when the circumstances are appropriate for the exercise of this privacy right depends on the proper identification of State interests. It is not surprising that courts have, in the course of investigating State interests in various medical contexts and under various formulations of the individual rights involved, reached differing views on the nature and the extent of State interests. We have undertaken a survey of some of the leading cases to help in identifying the range of State interests potentially applicable to cases of medical intervention.

In a number of cases, no applicable State interest, or combination of such interests, was found sufficient to outweigh the individual's interests in exercising the choice of refusing medical treatment. To this effect are *Erickson* v. *Dilgard,* 44 Misc. 2d 27 (N.Y. Sup. Ct. 1962) (scheme of liberty puts highest priority on free individual choice); *In re Estate of Brooks,* 32 Ill. 2d 361 (1965) (patient may elect to pursue religious beliefs by refusing life-saving blood transfusion provided the decision did not endanger public health, safety or morals); see *In re Osborne,* 294 A.2d 372 (D.C. Ct. App. 1972); *Holmes* v. *Silver Cross Hosp.,* 340 F. Supp. 125 (D. Ill. 1972); Byrn, Compulsory Lifesaving Treatment for the Competent Adult, 44 Fordham L. Rev. 1 (1975). See also *In re Guardianship of Pescinski,* 67 Wis. 2d 4 (1975).

Subordination of State interests to individual interests has not been universal, however. In a leading case, *Application of the President & Directors of Georgetown College, Inc.,* 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978 (1964), a hospital sought permission to perform a blood transfusion necessary to save the patient's life where the person was unwilling to consent due to religious beliefs. The court held that it had the power to allow the action to be taken despite the previously expressed contrary sentiments of the patient. The court justified its decision by reasoning that its purpose was to protect three State interests, the protection of which was viewed as having

greater import than the individual right: (1) the State interest in preventing suicide, (2) a parens patriae interest in protecting the patient's minor children from "abandonment" by their parent, and (3) the protection of the medical profession's desire to act affirmatively to save life without fear of civil liability. In *John F. Kennedy Memorial Hosp.* v. *Heston,* 58 N.J. 576 (1971), a case involving a fact situation similar to *Georgetown,* the New Jersey Supreme Court also allowed a transfusion. It based its decision on *Georgetown,* as well as its prior decisions. See *Raleigh Fitkin-Paul Morgan Memorial Hosp.* v. *Anderson,* 42 N.J. 421, cert. denied, 377 U.S. 985 (1964);[8] *State* v. *Perricone,* 37 N.J. 463, cert. denied, 371 U.S. 890 (1962). The New Jersey court held that the State's paramount interest in preserving life and the hospital's interest in fully caring for a patient under its custody and control outweighed the individual decision to decline the necessary measures. See *United States* v. *George,* 239 F. Supp. 752 (D. Conn. 1965); *Long Island Jewish-Hillside Medical Center* v. *Levitt,* 73 Misc. 2d 395 (N.Y. Sup. Ct. 1973); *In re Sampson,* 65 Misc. 2d 658 (Fam. Ct. 1970), aff'd 37 App. Div. 2d 668 (1971), aff'd per curiam, 29 N.Y.2d 900 (1972); *In re Weberlist,* 79 Misc. 2d 753 (N.Y. Sup. Ct. 1974); *In re Karwath,* 199 N.W.2d 147 (Iowa 1972).

This survey of recent decisions involving the difficult question of the right of an individual to refuse medical intervention or treatment indicates that a relatively concise statement of countervailing State interests may be made. As distilled from the cases, the State has claimed interest in: (1) the preservation of life; (2) the protection of the interests of innocent third parties; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession.

It is clear that the most significant of the asserted State interests is that of the preservation of human life. Recognition of such an interest, however, does not necessarily

---

[8] While *Quinlan* would seem to limit the effect of these decisions, the opinion therein does not make clear the extent to which this is so.

resolve the problem where the affliction or disease clearly indicates that life will soon, and inevitably, be extinguished. The interest of the State in prolonging a life must be reconciled with the interest of an individual to reject the traumatic cost of that prolongation. There is a substantial distinction in the State's insistence that human life be saved where the affliction is curable, as opposed to the State interest where, as here, the issue is not whether, but when, for how long, and at what cost to the individual that life may be briefly extended. Even if we assume that the State has an additional interest in seeing to it that individual decisions on the prolongation of life do not in any way tend to "cheapen" the value which is placed in the concept of living, see *Roe* v. *Wade, supra,* we believe it is not inconsistent to recognize a right to decline medical treatment in a situation of incurable illness. The constitutional right to privacy, as we conceive it, is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice.[9]

A second interest of considerable magnitude, which the State may have some interest in asserting, is that of protecting third parties, particularly minor children, from the emotional and financial damage which may occur as a result of the decision of a competent adult to refuse life-saving or life-prolonging treatment. Thus, in *Holmes* v. *Silver Cross Hosp.,* 340 F. Supp. 125 (D. Ill. 1972), the court held that, while the State's interest in preserving an individual's life was not sufficient, by itself, to outweigh the individual's interest in the exercise of free choice, the possible impact on minor children would be a factor which

---

[9] *Commonwealth* v. *O'Neal,* 367 Mass. 440 (1975), does not compel a different result. That case considered the magnitude of the State interest in preserving life in the context of an intentional State deprivation. It does not apply to a situation where an individual, without State involvement, may make a decision resulting in the shortening of life by natural causes.

might have a critical effect on the outcome of the balancing process. Similarly, in the *Georgetown* case the court held that one of the interests requiring protection was that of the minor child in order to avoid the effect of "abandonment" on that child as a result of the parent's decision to refuse the necessary medical measures. See Byrn, *supra* at 33; *United States* v. *George, supra.*[10] We need not reach this aspect of claimed State interest as it is not in issue on the facts of this case.

The last State interest requiring discussion[11] is that of the maintenance of the ethical integrity of the medical profession as well as allowing hospitals the full opportunity to care for people under their control. See *Georgetown, supra; United States* v. *George, supra; John F. Kennedy Memorial Hosp.* v. *Heston, supra.* The force and impact of this interest is lessened by the prevailing medical ethical standards, see Byrn, *supra* at 31. Prevailing medical ethical practice does not, without exception, demand that all efforts toward life prolongation be made in all circumstances. Rather, as indicated in *Quinlan,* the prevailing ethical practice seems to be to recognize that the dying are more often in need of comfort than treatment. Recognition of the right to refuse necessary treatment in appropriate

---

[10] The nature of the third-party interest discussed here is not one where the decision has clear, immediate, and adverse effects on the third party such as in *Raleigh Fitkin-Paul Morgan Memorial Hosp., supra,* where a blood transfusion was necessary to preserve the life of a child in utero, as well as the mother. Clearly, different considerations are presented in such a case.

[11] The interest in protecting against suicide seems to require little if any discussion. In the case of the competent adult's refusing medical treatment such an act does not necessarily constitute suicide since (1) in refusing treatment the patient may not have the specific intent to die, and (2) even if he did, to the extent that the cause of death was from natural causes the patient did not set the death producing agent in motion with the intent of causing his own death. Byrn, *supra* at 17-18. Cantor, *supra* at 255. Furthermore, the underlying State interest in this area lies in the prevention of irrational self-destruction. What we consider here is a competent, rational decision to refuse treatment when death is inevitable and the treatment offers no hope of cure or preservation of life. There is no connection between the conduct here in issue and any State concern to prevent suicide. Cantor, *supra* at 258.

circumstances is consistent with existing medical mores; such a doctrine does not threaten either the integrity of the medical profession, the proper role of hospitals in caring for such patients or the State's interest in protecting the same. It is not necessary to deny a right of self-determination to a patient in order to recognize the interests of doctors, hospitals, and medical personnel in attendance on the patient. Also, if the doctrines of informed consent and right of privacy have as their foundations the right to bodily integrity, see *Union Pac. Ry.* v. *Botsford,* 141 U.S. 250 (1891), and control of one's own fate, then those rights are superior to the institutional considerations.[12]

Applying the considerations discussed in this subsection to the decision made by the probate judge in the circumstances of the case before us, we are satisfied that his decision was consistent with a proper balancing of applicable State and individual interests. Two of the four categories of State interests that we have identified, the protection of third parties and the prevention of suicide, are inapplicable to this case. The third, involving the protection of the ethical integrity of the medical profession was satisfied on two grounds. The probate judge's decision was in accord with the testimony of the attending physicians of the patient. The decision is in accord with the generally accepted views of the medical profession, as set forth in this opinion. The fourth State interest — the preservation of life — has been viewed with proper regard for the heavy physical and emotional burdens on the patient if a vigorous regimen of drug therapy were to be imposed to effect a brief and uncertain delay in the natural process of death. To be balanced against these State interests was the individual's

---

[12] Any threats of civil liability may be removed by a valid giving or withholding of consent by an informed patient. See generally Note, Statutory Recognition of the Right to Die: The California Natural Death Act, 57 B.U.L. Rev. 148 (1977), for a comprehensive discussion of the common law foundations of physicians' duties and patients' rights, one legislative attempt to modernize the law, and an analysis of the ramifications for doctors and patients of recognizing the option of withholding life-sustaining procedures from a patient incapable of indicating his or her wishes.

interest in the freedom to choose to reject, or refuse to consent to, intrusions of his bodily integrity and privacy. We cannot say that the facts of this case required a result contrary to that reached by the probate judge with regard to the right of any person, competent or incompetent, to be spared the deleterious consequences of life-prolonging treatment. We therefore turn to consider the unique considerations arising in this case by virtue of the patient's inability to appreciate his predicament and articulate his desires.

### B.

The question what legal standards govern the decision whether to administer potentially life-prolonging treatment to an incompetent person encompasses two distinct and important subissues. First, does a choice exist? That is, is it the unvarying responsibility of the State to order medical treatment in all circumstances involving the care of an incompetent person? Second, if a choice does exist under certain conditions, what considerations enter into the decision-making process?

We think that principles of equality and respect for all individuals require the conclusion that a choice exists. For reasons discussed at some length in subsection A, *supra,* we recognize a general right in all persons to refuse medical treatment in appropriate circumstances. The recognition of that right must extend to the case of an incompetent, as well as a competent, patient because the value of human dignity extends to both.

This is not to deny that the State has a traditional power and responsibility, under the doctrine of parens patriae, to care for and protect the "best interests" of the incompetent person. Indeed, the existence of this power and responsibility has impelled a number of courts to hold that the "best interests" of such a person mandate an unvarying responsibility by the courts to order necessary medical treatment for an incompetent person facing an immediate and severe danger to life. *Application of the President & Directors of Georgetown College, Inc.,* 331

F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978 (1964). *Long Island Jewish-Hillside Medical Center* v. *Levitt*, 73 Misc. 2d 395 (N.Y. Sup. Ct. 1973). Cf. *In re Weberlist*, 79 Misc. 2d 753 (N.Y. Sup. Ct. 1974). Whatever the merits of such a policy where life-saving treatment is available — a situation unfortunately not presented by this case — a more flexible view of the "best interests" of the incompetent patient is not precluded under other conditions. For example, other courts have refused to take it on themselves to order certain forms of treatment or therapy which are not immediately required although concededly beneficial to the innocent person. *In re CFB*, 497 S.W.2d 831 (Mo. App. 1973). *Green's Appeal*, 448 Pa. 338 (1972). *In re Frank*, 41 Wash. 2d 294 (1952). Cf. *In re Rotkowitz*, 175 Misc. 948 (N.Y. Dom. Rel. Ct. 1941); *Mitchell* v. *Davis*, 205 S.W.2d 812 (Tex. App. 1947). While some of these cases involve children who might eventually be competent to make the necessary decisions without judicial interference, it is also clear that the additional period of waiting might make the task of correction more difficult. See, e.g., *In re Frank, supra.* These cases stand for the proposition that, even in the exercise of the parens patriae power, there must be respect for the bodily integrity of the child or respect for the rational decision of those parties, usually the parents, who for one reason or another are seeking to protect the bodily integrity or other personal interest of the child. See *In re Hudson*, 13 Wash. 2d 673 (1942).

The "best interests" of an incompetent person are not necessarily served by imposing on such persons results not mandated as to competent persons similarly situated. It does not advance the interest of the State or the ward to treat the ward as a person of lesser status or dignity than others. To protect the incompetent person within its power, the State must recognize the dignity and worth of such a person and afford to that person the same panoply of rights and choices it recognizes in competent persons. If a competent person faced with death may choose to decline treatment which not only will not cure the person but

which substantially may increase suffering in exchange for a possible yet brief prolongation of life, then it cannot be said that it is always in the "best interests" of the ward to require submission to such treatment. Nor do statistical factors indicating that a majority of competent persons similarly situated choose treatment resolve the issue. The significant decisions of life are more complex than statistical determinations. Individual choice is determined not by the vote of the majority but by the complexities of the singular situation viewed from the unique perspective of the person called on to make the decision. To presume that the incompetent person must always be subjected to what many rational and intelligent persons may decline is to downgrade the status of the incompetent person by placing a lesser value on his intrinsic human worth and vitality.

The trend in the law has been to give incompetent persons the same rights as other individuals. *Boyd* v. *Registrars of Voters of Belchertown,* 368 Mass. 631 (1975). Recognition of this principle of equality requires understanding that in certain circumstances it may be appropriate for a court to consent to the withholding of treatment from an incompetent individual. This leads us to the question of how the right of an incompetent person to decline treatment might best be exercised so as to give the fullest possible expression to the character and circumstances of that individual.

The problem of decision-making presented in this case is one of first impression before this court, and we know of no decision in other jurisdictions squarely on point. The well publicized decision of the New Jersey Court in *In re Quinlan,* 70 N.J. 10 (1976), provides a helpful starting point for analysis, however.

Karen Ann Quinlan, then age twenty-one, stopped breathing for reasons not clearly identified for at least two fifteen-minute periods on the night of April 15, 1975. As a result, this formerly healthy individual suffered severe brain damage to the extent that medical experts characterized her as being in a "chronic persistent vegetative

state." *Id.* at 24. Although her brain was capable of a certain degree of primitive reflex-level functioning, she had no cognitive function or awareness of her surroundings. Karen Quinlan did not, however, exhibit any of the signs of "brain death" as identified by the Ad Hoc Committee of the Harvard Medical School.[13] She was thus "alive" under controlling legal and medical standards. *Id.* at 25. Nonetheless, it was the opinion of the experts and conclusion of the court that there was no reasonable possibility that she would ever be restored to cognitive or sapient life. *Id.* at 26. Her breathing was assisted by a respirator, without which the experts believed she could not survive. It was for the purpose of getting authority to order the disconnection of the respirator that Quinlan's father petitioned the lower New Jersey court.

The Supreme Court of New Jersey, in a unanimous opinion written by Chief Justice Hughes, held that the father, as guardian, could, subject to certain qualifications,[14] exercise his daughter's right to privacy by authorizing removal of the artificial life-support systems. *Id.* at 55. The court thus recognized that the preservation of the personal right to privacy against bodily intrusions, not exercisable directly due to the incompetence of the right-holder, depended on its indirect exercise by one acting on behalf of the incompetent person. The exposition by the New Jersey court of the principle of substituted judgment, and of the legal standards that were to be applied by the guardian in making this decision, bears repetition here.

"If a putative decision by Karen to permit this non-cognitive, vegetative existence to terminate by natural forces is regarded as a valuable incident of her right of privacy, as we believe it to be, then it should not be dis-

---

[13] The brain death criteria developed by the Ad Hoc Committee was recently recognized by this court as a medically and legally acceptable definition of death. *Commonwealth* v. *Golston, ante,* 249, 251-255 (1977).

[14] The mandatory involvement of the family, attending doctors, and the hospital "ethics committee" was also provided for by the court. See note 20 *infra.*

carded solely on the basis that her condition prevents her conscious exercise of the choice. The only practical way to prevent destruction of the right is to *permit the guardian and family of Karen to render their best judgment,* subject to the qualifications [regarding consultation with attending physicians and hospital 'Ethics Committee'] hereinafter stated, *as to whether she would exercise it in these circumstances.* If their conclusion is in the affirmative this decision should be accepted by a society the overwhelming majority of whose members would, we think, in similar circumstances, exercise such a choice in the same way for themselves or for those closest to them. It is for this reason that we determine that Karen's right of privacy may be asserted in her behalf, in this respect, by her guardian and family under the particular circumstances presented by this record" (emphasis supplied). *Id.* at 41-42.

The court's observation that most people in like circumstances would choose a natural death does not, we believe, detract from or modify the central concern that the guardian's decision conform, to the extent possible, to the decision that would have been made by Karen Quinlan herself. Evidence that most people would or would not act in a certain way is certainly an important consideration in attempting to ascertain the predilections of any individual, but care must be taken, as in any analogy, to ensure that operative factors are similar or at least to take notice of the dissimilarities. With this in mind, it is profitable to compare the situations presented in the *Quinlan* case and the case presently before us. Karen Quinlan, subsequent to her accident, was totally incapable of knowing or appreciating life, was physically debilitated, and was pathetically reliant on sophisticated machinery to nourish and clean her body. Any other person suffering from similar massive brain damage would be in a similar state of total incapacity, and thus it is not unreasonable to give weight to a supposed general, and widespread, response to the situation.

Karen Quinlan's situation, however, must be distin-

guished from that of Joseph Saikewicz. Saikewicz was profoundly mentally retarded. His mental state was a cognitive one but limited in his capacity to comprehend and communicate. Evidence that most people choose to accept the rigors of chemotherapy has no direct bearing on the likely choice that Joseph Saikewicz would have made. Unlike most people, Saikewicz had no capacity to understand his present situation or his prognosis. The guardian ad litem gave expression to this important distinction in coming to grips with this "most troubling aspect" of withholding treatment from Saikewicz: "If he is treated with toxic drugs he will be involuntarily immersed in a state of painful suffering, the reason for which he will never understand. Patients who request treatment know the risks involved and can appreciate the painful side-effects when they arrive. They know the reason for the pain and their hope makes it tolerable." To make a worthwhile comparison, one would have to ask whether a majority of people would choose chemotherapy if they were told merely that something outside of their previous experience was going to be done to them, that this something would cause them pain and discomfort, that they would be removed to strange surroundings and possibly restrained for extended periods of time, and that the advantages of this course of action were measured by concepts of time and mortality beyond their ability to comprehend.

To put the above discussion in proper perspective, we realize that an inquiry into what a majority of people would do in circumstances that truly were similar assumes an objective viewpoint not far removed from a "reasonable person" inquiry. While we recognize the value of this kind of indirect evidence, we should make it plain that the primary test is subjective in nature — that is, the goal is to determine with as much accuracy as possible the wants and needs of the individual involved.[15] This may or may

[15] In arriving at a philosophical rationale in support of a theory of substituted judgment in the context of organ transplants from incompetent persons, Professor Robertson of the University of Wisconsin Law School argued that "maintaining the integrity of the person means that

not conform to what is thought wise or prudent by most people. The problems of arriving at an accurate substituted judgment in matters of life and death vary greatly in degree, if not in kind, in different circumstances. For example, the responsibility of Karen Quinlan's father to act as she would have wanted could be discharged by drawing on many years of what was apparently an affectionate and close relationship. In contrast, Joseph Saikewicz was profoundly retarded and noncommunicative his entire life, which was spent largely in the highly restrictive atmosphere of an institution. While it may thus be necessary to rely to a greater degree on objective criteria, such as the supposed inability of profoundly retarded persons to conceptualize or fear death, the effort to bring the substituted judgment into step with the values and desires of the affected individual must not, and need not, be abandoned.

The "substituted judgment" standard which we have described commends itself simply because of its straightforward respect for the integrity and autonomy of the individual. We need not, however, ignore the substantial pedigree that accompanies this phrase. The doctrine of substituted judgment had its origin over 150 years ago in the area of the administration of the estate of an incompetent person. *Ex parte Whitbread in re Hinde, a Lunatic,* 35 Eng. Rep. 878 (1816). The doctrine was utilized to authorize a gift from the estate of an incompetent person

---

we act toward him 'as we have reason to believe [he] would choose for [himself] if [he] were [capable] of reason and deciding rationally.' It does not provide a license to impute to him preferences he never had or to ignore previous preferences. . . . If preferences are unknown, we must act with respect to the preferences a reasonable, competent person in the incompetent's situation would have." Robertson, Organ Donations by Incompetents and the Substituted Judgment Doctrine, 76 Colum. L. Rev. 48, 63 (1976), quoting J. Rawls, A Theory of Justice, 209 (1971). In this way, the "free choice and moral dignity" of the incompetent person would be recognized. "Even if we were mistaken in ascertaining his preferences, the person [if he somehow became competent] could still agree that he had been fairly treated, if we had a good reason for thinking he would have made the choices imputed to him." Robertson, *supra* at 63.

to an individual when the incompetent owed no duty of support. The English court accomplished this purpose by substituting itself as nearly as possible for the incompetent, and acting on the same motives and considerations as would have moved him. *City Bank Farmers Trust Co.* v. *McGowan,* 323 U.S. 594, 599 (1945). In essence, the doctrine in its inception called on the court to "don the mental mantle of the incompetent." *In re Carson,* 39 Misc. 2d 544, 545 (N.Y. Sup. Ct. 1962). Cf. *Strange* v. *Powers,* 358 Mass. 126 (1970).

In modern times the doctrine of substituted judgment has been applied as a vehicle of decision in cases more analogous to the situation presented in this case. In a leading decision on this point, *Strunk* v. *Strunk,* 445 S.W.2d 145 (Ky. Ct. App. 1969), the court held that a court of equity had the power to permit removal of a kidney from an incompetent donor for purposes of effectuating a transplant. The court concluded that, due to the nature of their relationship, both parties would benefit from the completion of the procedure, and hence the court could presume that the prospective donor would, if competent, assent to the procedure. Accord, *Hart* v. *Brown,* 29 Conn. Supp. 368 (1972). But see *In re Guardianship of Pescinski,* 67 Wis. 2d 4 (1975). See generally Baron and others, Life Organ and Tissue Transplants from Minor Donors in Massachusetts, 55 B.U.L. Rev. 159 (1975).[16]

With this historical perspective, we now reiterate the substituted judgment doctrine as we apply it in the instant case. We believe that both the guardian ad litem in his recommendation and the judge in his decision should have attempted (as they did) to ascertain the incompetent person's actual interests and preferences. In short, the decision in cases such as this should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and

---

[16] In a similar matter before a single justice of this court, *Nathan* v. *Farinelli,* Suffolk Eq. 74-87, use of the doctrine was rejected, but primarily because the facts of the case involved potential conflicts of interest and made it inapplicable.

future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person. Having recognized the right of a competent person to make for himself the same decision as the court made in this case, the question is, do the facts on the record support the proposition that Saikewicz himself would have made the decision under the standard set forth. We believe they do.

The two factors considered by the probate judge to weigh in favor of administering chemotherapy were: (1) the fact that most people elect chemotherapy and (2) the chance of a longer life. Both are appropriate indicators of what Saikewicz himself would have wanted, provided that due allowance is taken for this individual's present and future incompetency. We have already discussed the perspective this brings to the fact that most people choose to undergo chemotherapy. With regard to the second factor, the chance of a longer life carries the same weight for Saikewicz as for any other person, the value of life under the law having no relation to intelligence or social position. Intertwined with this consideration is the hope that a cure, temporary or permanent, will be discovered during the period of extra weeks or months potentially made available by chemotherapy. The guardian ad litem investigated this possibility and found no reason to hope for a dramatic breakthrough in the time frame relevant to the decision.

The probate judge identified six factors weighing against administration of chemotherapy. Four of these — Saikewicz's age,[17] the probable side effects of treatment, the low chance of producing remission, and the certainty that treatment will cause immediate suffering — were clearly established by the medical testimony to be considerations

---

[17] This factor is relevant because of the medical evidence in the record that people of Saikewicz's age do not tolerate the chemotherapy as well as younger people and that the chance of a remission is decreased. Age is irrelevant, of course, to the question of the value or quality of life.

that any individual would weigh carefully. A fifth factor — Saikewicz's inability to cooperate with the treatment — introduces those considerations that are unique to this individual and which therefore are essential to the proper exercise of substituted judgment. The judge heard testimony that Saikewicz would have no comprehension of the reasons for the severe disruption of his formerly secure and stable environment occasioned by the chemotherapy. He therefore would experience fear without the understanding from which other patients draw strength. The inability to anticipate and prepare for the severe side effects of the drugs leaves room only for confusion and disorientation. The possibility that such a naturally uncooperative patient would have to be physically restrained to allow the slow intravenous administration of drugs could only compound his pain and fear, as well as possibly jeopardize the ability of his body to withstand the toxic effects of the drugs.

The sixth factor identified by the judge as weighing against chemotherapy was "the quality of life possible for him even if the treatment does bring about remission." To the extent that this formulation equates the value of life with any measure of the quality of life, we firmly reject it. A reading of the entire record clearly reveals, however, the judge's concern that special care be taken to respect the dignity and worth of Saikewicz's life precisely because of his vulnerable position. The judge, as well as all the parties, was keenly aware that the supposed inability of Saikewicz, by virtue of his mental retardation, to appreciate or experience life had no place in the decision before them. Rather than reading the judge's formulation in a manner that demeans the value of the life of one who is mentally retarded, the vague, and perhaps ill-chosen, term "quality of life" should be understood as a reference to the continuing state of pain and disorientation precipitated by the chemotherapy treatment. Viewing the term in this manner, together with the other factors properly considered by the judge, we are satisfied that the decision to withhold treatment from Saikewicz was based

on a regard for his actual interests and preferences and that the facts supported this decision.

## C.

We turn now to a consideration of the procedures appropriate for reaching a decision where a person allegedly incompetent is in a position in which a decision as to the giving or withholding of life-prolonging treatment must be made.[18] As a preliminary matter, we briefly inquire into the powers of the Probate Court in this context.

The Probate Court is a court of superior and general jurisdiction. G. L. c. 215, § 2. *Wilder* v. *Orcutt,* 257 Mass. 100 (1926). The Probate Court is given equity jurisdiction by statute. G. L. c. 215, § 6. It has been given the specific grant of equitable powers to act in all matters relating to guardianship. G. L. c. 215, § 6. *Buckingham* v. *Alden,* 315 Mass. 383, 387 (1944). The Probate Court has the power to appoint a guardian for a retarded person. G. L. c. 201, § 6A. It may also appoint a temporary guardian of such a person where immediate action is required. G. L. c. 201, § 14. Additionally, the Probate Court may appoint a guardian ad litem whenever the court believes it necessary to protect the interests of a person in a proceeding before it. *Buckingham* v. *Alden, supra.* This power is inherent in the court even apart from statutory authorization, and its exercise at times becomes necessary for the proper function of the court. *Lynde* v. *Vose,* 326 Mass. 621 (1951). *Buckingham* v. *Alden, supra.*

In dealing with matters concerning a person properly under the court's protective jurisdiction, "[t]he court's action ... is not limited by any narrow bounds, but it is empowered to stretch forth its arm in whatever direction its aid and protection may be needed." *In re Quinlan,* 70 N.J. 10, 45 (1976), quoting from 27 Am. Jur. 2d Equity

---

[18] We decline the invitation of several of the amicus and party briefs to formulate a comprehensive set of guidelines applicable generally to emergency medical situations involving incompetent persons. Such a wide-ranging effort is better left to the legislative branch after appropriate study.

§ 69 (1966). In essence the powers of the court to act in the best interests of a person under its jurisdiction, *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 371 Mass. 651 (1976), must be broad and flexible enough "to afford whatever relief may be necessary to protect his interests." *Strunk* v. *Strunk*, 445 S.W.2d 145, 147 (Ky. Ct. App. 1969), quoting from 27 Am. Jur. 2d Equity § 69, at 592 (1966). The Probate Court is the proper forum in which to determine the need for the appointment of a guardian or a guardian ad litem. It is also the proper tribunal to determine the best interests of a ward.

In this case, a ward of a State institution was discovered to have an invariably fatal illness, the only effective — in the sense of life-prolonging — treatment for which involved serious and painful intrusions on the patient's body. While an emergency existed with regard to taking action to begin treatment, it was not a case in which immediate action was required. Nor was this a case in which life-saving, as distinguished from life-prolonging, procedures were available. Because the individual involved was thought to be incompetent to make the necessary decisions, the officials of the State institutions properly initiated proceedings in the Probate Court.

The course of proceedings in such a case is readily determined by reference to the applicable statutes. The first step is to petition the court for the appointment of a guardian (G. L. c. 201, § 6A) or a temporary guardian (G. L. c. 201, § 14). The decision under which of these two provisions to proceed will be determined by the circumstances of the case, that is, whether the exigencies of the situation allow time to comply with the seven-day notice requirement prior to the hearing on the appointment of a guardian. G. L. c. 201, §§ 6A, 7. If appointment of a temporary guardian is sought, the probate judge will make such orders regarding notice as he deems appropriate. G. L. c. 201, § 14. At the hearing on the appointment of a guardian or temporary guardian, the issues before the court are (1) whether the person involved is

mentally retarded within the meaning of the statute (G. L. c. 201, § 6A) and (2), if the person is mentally retarded, who shall be appointed guardian. *Id.* As an aid to the judge in reaching these two decisions, it will often be desirable to appoint a guardian ad litem, sua sponte or on motion, to represent the interests of the person. Moreover, we think it appropriate, and highly desirable, in cases such as the one before us to charge the guardian ad litem with an additional responsibility to be discharged if there is a finding of incompetency. This will be the responsibility of presenting to the judge, after as thorough an investigation as time will permit, all reasonable arguments in favor of administering treatment to prolong the life of the individual involved. This will ensure that all viewpoints and alternatives will be aggressively pursued and examined at the subsequent hearing where it will be determined whether treatment should or should not be allowed. The report of the guardian or temporary guardian will, of course, also be available to the judge at this hearing on the ultimate issue of treatment.[19] Should the probate judge then be satisfied that the incompetent individual would, as determined by the standards previously set forth, have chosen to forgo potentially life-prolonging treatment, the judge shall issue the appropriate order. If the judge is not so persuaded, or finds that the interests of the State require it, then treatment shall be ordered.

Commensurate with the powers of the Probate Court already described, the probate judge may, at any step in these proceedings, avail himself or herself of the additional

---

[19] We note that the probate judge in the instant case would more appropriately have appointed a temporary guardian under G. L. c. 201, § 14, subsequent to an initial determination that Saikewicz was incompetent to make his own decision regarding treatment. Instead the judge appointed a guardian ad litem to discharge the duties of a general guardian. In view of the facts, however, we are of the view that nothing of substance turns on this distinction in this case. We also note the existence of some confusion and doubt concerning the power of a probate judge to appoint a temporary guardian for a mentally retarded person prior to the amendment in 1976 of G. L. c. 201, § 14, by St. 1976, c. 277.

advice or knowledge of any person or group. We note here that many health care institutions have developed medical ethics committees or panels to consider many of the issues touched on here. Consideration of the findings and advice of such groups as well as the testimony of the attending physicians and other medical experts ordinarily would be of great assistance to a probate judge faced with such a difficult decision. We believe it desirable for a judge to consider such views wherever available and useful to the court. We do not believe, however, that this option should be transformed by us into a required procedure. We take a dim view of any attempt to shift the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction to any committee, panel or group, ad hoc or permanent. Thus, we reject the approach adopted by the New Jersey Supreme Court in the *Quinlan* case of entrusting the decision whether to continue artificial life support to the patient's guardian, family, attending doctors, and hospital "ethics committee."[20] 70 N.J. at 55. One rationale for such a delegation was expressed by the lower court judge in the *Quinlan* case, and quoted by the New Jersey Supreme Court: "The nature, extent and duration of care by societal standards is the responsibility of a physician. The morality and conscience of our society places this responsibility in the hands of the physician. What justification is there to remove it from the

---

[20] Specifically, the court held that "upon the concurrence of the guardian and family of Karen, should the responsible attending physicians conclude that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state and that the life-support apparatus now being administered to Karen should be discontinued, they shall consult with the hospital 'Ethics Committee' or like body of the institution in which Karen is then hospitalized. If that consultative body agrees that there is no reasonable possibility of Karen's ever emerging from her present comatose condition to a cognitive, sapient state, the present life-support system may be withdrawn and said action shall be without any civil or criminal liability therefor, on the part of any participant, whether guardian, physician, hospital or others.

"By the above ruling we do not intend to be understood as implying that a proceeding for judicial declaratory relief is necessarily required for the implementation of comparable decisions in the field of medical practice." *In re Quinlan,* 70 N.J. at 55.

control of the medical profession and place it in the hands of the courts?" *Id.* at 44. For its part, the New Jersey Supreme Court concluded that "a practice of applying to a court to confirm such decisions would generally be inappropriate, not only because that would be a gratuitous encroachment upon the medical profession's field of competence, but because it would be impossibly cumbersome. Such a requirement is distinguishable from the judicial overview traditionally required in other matters such as the adjudication and commitment of mental incompetents. This is not to say that in the case of an otherwise justiciable controversy access to the courts would be foreclosed; we speak rather of a general practice and procedure." *Id.* at 50.

We do not view the judicial resolution of this most difficult and awesome question — whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision — as constituting a "gratuitous encroachment" on the domain of medical expertise. Rather, such questions of life and death seem to us to require the process of detached but passionate investigation and decision that forms the ideal on which the judicial branch of government was created. Achieving this ideal is our responsibility and that of the lower court, and is not to be entrusted to any other group purporting to represent the "morality and conscience of our society," no matter how highly motivated or impressively constituted.

### III.

Finding no State interest sufficient to counterbalance a patient's decision to decline life-prolonging medical treatment in the circumstances of this case, we conclude that the patient's right to privacy and self-determination is entitled to enforcement. Because of this conclusion, and in view of the position of equality of an incompetent person in Joseph Saikewicz's position, we conclude that the probate judge acted appropriately in this case. For these reasons we issued our order of July 9, 1976, and responded as we did to the questions of the probate judge.