IN THE MATTER OF EARLE N. SPRING.

Franklin. September 10, 1979. – December 21, 1979.

Present: HALE, C.J., ARMSTRONG, & GREANEY, JJ.

*Medicine,* Withholding medical treatment. *Probate Court,* Withholding medical treatment, Incompetent person. *Incompetent Person,* Consent to medical treatment, Right to refuse medical treatment.

In an action in a Probate Court seeking an order that hemodialysis treatments, which were sustaining the life of an incompetent person, be terminated, there was sufficient evidence to warrant a finding that the ward would elect to terminate further dialysis treatments if competent to do so. [837-841]

A patient's mental condition was, in the circumstances, a relevant factor in determining whether he would elect, if competent to do so, to undergo intrusive life-prolonging treatments. [839-840]

The judgment of a patient's family and the recommendation of his attending physician were, in the circumstances, relevant factors in

determining whether the patient would elect, if competent to do so, to undergo intrusive life-prolonging treatments. [840]

In an action in a Probate Court seeking an order that hemodialysis treatments, which were sustaining the life of an incompetent person, be terminated, the judge did not err in declaring that, in view of the finding that the ward would elect not to submit to further dialysis treatments if competent to do so, the ward's attending physician, together with the ward's wife and son, were to make the determination whether to continue the treatments. [841-847]

PETITION filed in the Franklin Division of the Probate and Family Court Department on January 25, 1979.

The case was heard by *Keedy, J.*

*Mark I. Berson,* guardian ad litem, pro se.

*Marguerite M. Dolan* for the petitioners.

ARMSTRONG, J. On January 25, 1979, the temporary guardian of the ward, Earle N. Spring, an incompetent person, and the ward's wife Blanche Spring, petitioned a Probate Court for an order that hemodialysis treatments, which were and are sustaining the life of the ward, be terminated. The probate judge appointed a guardian ad litem, who opposed allowance of the petition. On May 15, 1979, after hearing, a judgment entered ordering the temporary guardian, who is the ward's son, to "refrain from authorizing any further life-prolonging medical treatment." The guardian ad litem appealed from, and obtained a stay of, that judgment. On July 2, 1979, the judge vacated the judgment of May 15 and entered a new judgment to the effect that the ward's attending physician, together with the ward's wife and son, were to make the decision whether to continue or terminate the dialysis treatments. The guardian ad litem contends in this appeal that the two judgments — the first apparently modeled on one entered in the *Saikewicz* case[1] and the second apparently sug-

---

[1] *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728, 730 n.2 (1977).

gested by a passage in the *Dinnerstein* case[2] — are incorrect as matter of law on the facts found by the judge.[3]

The judge's subsidiary findings are fully warranted by the evidence and are not contested. The ward was born in 1901 and has been married to the copetitioner Blanche Spring for more than fifty-five years. They had one son, the copetitioner Robert N. Spring, who is married and has lived for many years in a house across the street from his parents' house in the town of Montague. In his working years the ward was the chief chemist and metallurgist at a tool and die plant in Greenfield. He was an outdoorsman, an avid hunter and fisherman. He retired in 1966, and he and Mrs. Spring were able to travel for a period of years before the onset of the illnesses which culminated in the filing of the instant petition.

The illnesses began in November, 1977. The ward hurt his foot, developed an infection in it, and was admitted to a hospital. After his discharge he was soon readmitted, apparently suffering from pneumonia. He developed kidney failure, coming close to death from that cause. He was transferred in February, 1978, from Greenfield to a hospital in Springfield, where dialysis treatments began. He was discharged in March, 1978, returned home to Montague, and from that time was transported three times a week by his wife and son to a private kidney center in Springfield for dialysis treatments. Those treatments, which continue to the present, last five hours each. The ward has "end-stage kidney disease," which is a total, or virtually total, and irre-

---

[2] *Matter of Dinnerstein,* 6 Mass. App. Ct. 466, 474-475 (1978).

[3] Procedurally, the only appeal before us is that claimed on June 11, 1979, from the May 15 judgment, and, as that judgment was made moot by the judgment of July 2, the appeal is technically subject to dismissal. In our discretion we overlook the procedural defect, as did the parties, because the issues have been fully argued and because the second judgment, while on its face a wholly new and different judgment, represents in effect (as will be seen later in this opinion) a formal rather than a substantial amendment of the earlier judgment.

versible loss of kidney function. Dialysis does not cure the underlying disease; it is a substitute for the absent kidney function. Without dialysis the ward would die within a month.

At the outset of this period of physical deterioration the ward was showing signs of mental disorientation. After March, 1978, his behavior at home became somewhat belligerent and destructive, and he became unable to care for himself. In October, 1978, he was diagnosed by a psychiatrist at the Bay State Medical Center in Springfield as having "chronic organic brain syndrome"; by January, 1979, his mental deterioration had progressed to the point where he had ceased to be able to recognize his wife and son.

In October, 1978, Mrs. Spring suffered a stroke, temporarily losing her ability to speak. (Robert Spring attributed the stroke to strain and exhaustion resulting from his father's behavior and condition.) She entered a nursing home in Holyoke and commenced a program of speech therapy at a Holyoke hospital. The ward entered the same nursing home in November, 1978, from which he is transported by van three times a week to Springfield for his dialysis treatments. By March, 1979, Mrs. Spring was well enough to be discharged to her home, where she is progressing satisfactorily, freed from the day-to-day responsibility of caring for her husband, and is able to take care of herself.

The ward's condition, by contrast, has deteriorated further since he entered the nursing home. Although in appearance he does not differ from other patients in the nursing home, his mental confusion seems total, and his conversation is nonsense. He appears not to understand who or where he is. As mentioned before, he does not recognize his wife and son. He sometimes wanders about at night having, on occasion, to be physically restrained. His impulse to disruptive behavior is controlled through heavy sedation. Nevertheless, he has occasionally kicked nurses, resisted transportation for dia-

lysis, and pulled the dialysis tubing from his body. Although the dialysis is accompanied by some pain, the evidence falls short, perhaps, of demonstrating that the ward resists dialysis particularly; it does warrant a finding that he has no understanding whatever of its purpose, and, due to his general disruptiveness, it is forced on him without his consent. His physical condition is generally good, but for the total loss of kidney function. His dementia is irreversible.

It is the view of Mrs. Spring and Robert Spring that the ward, if he were competent to express a view, would wish in the circumstances to have dialysis discontinued, although that would result in his death. The judge made a finding that that would in fact be the ward's wish. Mrs. Spring, Robert Spring, and the doctor who administers the dialysis treatments (he appears to be the only attending physician) all concur in urging the court to permit dialysis to be discontinued.[4]

The general parameters of our law applicable to the giving or withholding of medical treatment in cases of incompetency were recently spelled out in *Superintendent of Belchertown State Sch.* v. *Saikewicz,* 373 Mass. 728 (1977), and were applied and amplified in *Lane* v. *Candura,* 6 Mass. App. Ct. 377 (1978); and *Matter of Dinnerstein,* 6 Mass. App. Ct. 466 (1978). See also the related cases of *Custody of a Minor,* 375 Mass. 733, 752-756 (1978); and *Commissioner of Correction* v. *Myers,* 379 Mass. 255 (1979). It is well established that, except in an emergency, medical treatment may not be administered without the consent of the patient or his parent, guard-

---

[4]The physician implied that dialysis treatments would not be initiated for a patient known to be in the present condition of the ward. But mental confusion is a usual symptom of a patient suffering from kidney failure, and until dialysis has been tried it often cannot be known whether the patient is a suitable candidate for long-term maintenance by dialysis.

ian, or other custodian or legal representative.[5] *Red-dington* v. *Clayman,* 334 Mass. 244 (1956). *Baird* v. *Attorney Gen.,* 371 Mass. 741, 753-754 (1977). Prosser, Torts § 18 at 102-103 (4th ed. 1971). The corollary is that a competent adult generally has a right to refuse medical treatment, even where such treatment is necessary to save his life. *Lane* v. *Candura, supra.* That right is not absolute, however, but is subject in some circumstances to being balanced against the countervailing interest of the State in the preservation of life, aspects of which include the interest of the State in the prevention of suicide, in the protection of innocent third parties, and in the maintenance of the ethical integrity of the medical

[5] By traditional teaching the administration of treatment without consent constitutes (subject to an exception for emergencies) a battery, which is defined as an intentional, unpermitted contact with another person. Prosser, Torts § 9, at 34 (4th ed. 1971). "The gist of the action for battery is not the hostile intent of the defendant, but rather the absence of consent to the contact on the part of the plaintiff." *Id.* at 36. In the *Dinnerstein* case we stated, by way of dictum, a proposition which, on further reflection, we think is overbroad: that "[the *Saikewicz* case], implicitly, would appear to [have] establish[ed] a rule of law that unless such a court determination [i.e., a determination that life-saving or life-prolonging treatment may be withheld] has been obtained, it is the duty of a doctor attending an incompetent patient to employ whatever life-saving or life-prolonging treatments the current state of the art has put in his hands." *Dinnerstein,* 6 Mass. App. Ct. at 471). We think a more accurate formulation would be that the *Saikewicz* case recognizes a presumption in favor of the life-saving, life-prolonging treatment decision — a factual presumption, based on common experience, that most persons would elect life over death, regardless of age or level of intelligence — and that where a life-saving, or life-prolonging treatment is readily or reasonably available, the law begins with a presumption that the incompetent person would consent to its use and that a medical decision to treat is presumptively appropriate. For this reason the law recognizes as valid a consent to treatment of an incompetent person given in the traditional manner by family, next-of-kin, or a guardian. *Dinnerstein, supra* at 471 n.5. The presumption attenuates, of course, where life will be short in any event or where the prognosis for life without great suffering is dim and where the treatment itself will exact "a significant price . . . in return for saving [the patient's] life." *Myers,* 379 Mass. at 263.

profession. *Saikewicz,* 373 Mass. at 741., *Myers,* 379 Mass. at 263.[6]

The *Saikewicz* case held that a person does not through incompetency lose his right to be "free from non-consensual invasion of his bodily integrity" (373 Mass. at 739); that "the substantive rights of the competent and the incompetent person are the same in regard to the right to decline potentially life-prolonging treatment" (*id.* at 736); and that the conceptual mechanism by which the right of the incompetent person to refuse medical treatment is to be effectuated is the doctrine of "substituted judgment" (*id.* at 747-753), by which is meant the judgment that the incompetent person would himself make in the circumstances if he were competent to do so. "[T]he goal is to determine with as much accuracy as possible the wants and needs of the individual involved." *Saikewicz,* 373 Mass. at 750.

By the terms of this framework, the present case pivots on the finding made by the judge that, in these circumstances, the ward would wish to have the dialysis treatments discontinued. This finding did not rest on any expression of such an intention by the ward, and the guardian contended in the trial court that, absent such an expression of intent by the ward when he was competent, such a finding could not appropriately be made. The judge correctly rejected that contention: carried to a conclusion, it would largely stifle the very rights of privacy and personal dignity which the *Saikewicz* case sought to secure for incompetent persons. The essence

---

[6] The list is not exclusive, as is illustrated by the *Myers* case. There a prisoner in a State correctional institution was made to submit to life-prolonging dialysis treatments, regardless of his off-again, on-again lack of consent (apparently intended to gain concessions from prison authorities), in the interest of maintaining order, security and discipline within the prison population. The case inferentially reaffirms the traditional concept that medical treatment may not be administered to a non-consenting competent adult in the absence of a court order authorizing such treatment.

of that case is that when a person becomes incompetent to formulate a lucid judgment he is not thereby stripped of the right of choice enjoyed by others in the making of treatment decisions. *Saikewicz,* 373 Mass. at 745-747. An expression of opinion by the patient when competent would obviously be of great assistance, especially where the expression indicates a contemplation or understanding of the circumstances later obtaining; but the right secured by the *Saikewicz* case is not conditioned on the patient's having had the presence of mind to formulate such an expression of his wishes when competent.

The judge's finding that the ward would wish to have dialysis terminated appears to have been determined in the light of eight subsidiary considerations: (1) the fact that he had led an active, robust, independent life; (2) the fact that he has fallen into a pitiable state of physical dependence and mental incapacity; (3) the fact that no improvement can be expected in his physical or mental condition, but only further deterioration; (4) the fact that dialysis treatments exact a significant toll in terms of frequency and duration of treatments and uncomfortable side effects;[7] (5) the fact that the ward has no understanding of the nature and purpose of his treatments and cannot cooperate and does not reliably acquiesce in their administration; (6) the fact that his wife and son, with whom the ward had and has a very close relationship, feel that it would be his wish not to continue with dialysis in the present circumstances; (7) the fact that it is their wish that dialysis not be administered; and (8) the fact that the attending physician recommends against a continuation of dialysis treatments in these circumstances. We hold that, in light of these considerations, the judge's general finding that the ward would wish not to submit to further dialysis treatments was

---

[7] The testimony concerning the duration, discomforts and side effects of dialysis was substantially the same as that recounted in the *Myers* case, 379 Mass. at 258, 259-260.

warranted by the evidence and was not, by the standard of review set out in Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), "clearly erroneous."

Certain of the listed considerations require discussion. The guardian ad litem contends that the ward's condition of mental incapacity may not be appropriately taken into account without violating the principle stated in the *Saikewicz* case, that the "supposed ability of [the patient] . . . to appreciate or experience life has no place in the decision . . . ." 373 Mass. at 754. We think that the guardian's contention involves a misapplication of that principle. In context, the court was making the important points that "the value of life under the law [has] no relation to intelligence or social position" (373 Mass. at 753) and that the State's interest in the preservation of life is no less in the case of a profoundly mentally retarded person such as Joseph Saikewicz than it is in the case of one more gifted. That principle is of particular significance in applying the balancing test between the various State interests in the preservation of life and the interest of the individual "in avoiding significant, nonconsensual invasion of his bodily integrity." *Myers,* 379 Mass. at 263. But a patient's mental condition will in certain circumstances be a relevant factor in determining whether he would elect, if competent to do so, to undergo an intrusive life-saving or life-prolonging treatment. "[T]he decision in cases such as this should be that which would be made by the incompetent person, if that person were competent, but taking into account the present and future incompetency of the individual as one of the factors which would necessarily enter into the decision-making process of the competent person." *Saikewicz,* 373 Mass. at 752-753. That statement seems fully in accord with common experience; it is hardly unusual to hear people observe that they would not wish to cling to life for long after their mental faculties have been taken from them. That point of view would not have been relevant in the case of Joseph Saikewicz, for he had known no other con-

dition; but it can be appropriately considered in the case of one who has been reduced in a short time from a state of physical and mental vigor to one of total and irreversible dependence and incompetency, when the evidence generally suggests that that state of incompetency would be a factor which the patient would himself take into account in making a treatment decision if he were able to do so.

Another factor which should be touched on is the role of the family and the recommendation of the attending physician in applying the substituted judgment test. The evidence in this case is that the ward and his wife have been married for fifty-five years; that their son had lived across the street from them for more than fifteen years and has visited them substantially every day during that time; and that the wife and son have been active participants in caring for the ward's needs since the onset of his precipitous physical and mental deterioration. It is evident that we are dealing with a close-knit family unit, with a long history of mutual love, concern and support.[8] In such circumstances the decision of the family, particularly where that decision is in accord with the recommendation of the attending physician, is of particular importance, both as evidence of the decision the patient himself would make in the circumstances and, at a later stage of analysis, as a factor lending added weight to the patient's interest in privacy and personal dignity in the face of any countervailing State interests.[9]

[8] The evidence indicated that financial considerations are not involved, for, although the family is apparently of modest means (the worth of the ward's estate is apparently in the vicinity of $4,000), the dialysis treatments are being paid for by "Social Security," presumably Medicare. We intimate no opinion on the weight to be given the factor of cost to the family where that is a relevant consideration.

[9] The importance of the role of the family and the doctor is highlighted by the self-evident fact that the vast majority of treatment decisions relative to persons who are incompetent by reason of senility or retardation are made for them, by their family and the doctor, without court proceedings. This practice is sanctioned not merely by tra-

Probably the strongest factor which would, standing by itself, tend towards a contrary determination of the ward's wishes is the fact that, at a time when he was mentally competent (although subject to some degree of impairment), he himself consented to, or at least acquiesced in, the initiation of dialysis treatments. But conditions were different at that time. The ward could then understand the necessity for the treatments and the accompanying discomfort and cooperate in their administration. Compare *Saikewicz,* 373 Mass. at 753-755. When the treatments were initiated, it was hoped that they would restore the ward's ability to enjoy a relatively normal existence, subject of course to the burden of lengthy and uncomfortable treatments far from home three times a week, but otherwise permitting him the pleasures of life with his family in familiar and comfortable surroundings. Unfortunately, this hope did not and cannot materialize; he is, and must remain, institutionalized, heavily sedated to restrain his hostile impulses, uncooperative towards his arduous maintenance program, insensible of his family and his situation. There now obtains a very different set of circumstances from those in which the decision to undertake dialysis was made; whether the present circumstances would influence the ward to make a different decision is obviously a question not of law but of fact, one which the trier of fact is in a position superior to that of an appellate court to resolve. By the appropriate appellate test, the judge's determination was, as we have indicated, fully warranted by the evidence, consistent with his other articulated findings, and therefore not clearly erroneous.

It is thus established as a fact that it would be the ward's wish, if competent, to discontinue dialysis

---

dition but by the institutional limitations in the ability of courts to make day-to-day treatment decisions, even if restricted to treatments of a potentially life-saving or life-prolonging nature. See *Matter of Dinnerstein,* 6 Mass. App. Ct. at 471 n.5.

treatments. But because the ward is an incompetent person, towards whom the State stands in the relation of parens patriae, his "wish," as thus determined, is not necessarily decisive of the case. The general rule is that "[t]he constitutional right to privacy . . . is an expression of the sanctity of individual free choice and self-determination as fundamental constituents of life. The value of life as so perceived is lessened not by a decision to refuse treatment, but by the failure to allow a competent human being the right of choice." *Saikewicz,* 373 Mass. at 742. For applications of that principle, see the *Candura* case, 6 Mass. App. Ct. at 378-379; *Holmes* v. *Silver Cross Hosp.,* 340 F.Supp. 125 (D.Ill. 1972); *In re Osborne,* 294 A.2d 372 (D.C. Ct. App. 1972); *Satz* v. *Perlmutter,* 362 So.2d 160, 163 n.3 (Fla. App. 1978); *In re Estate of Brooks,* 32 Ill. 2d 361 (1965); *Matter of Schiller,* 148 N.J. Super. 168, 178 (1977); *Matter of Quackenbush,* 156 N.J. Super. 282 (1978); *Erickson* v. *Dilgard,* 44 Misc. 2d 27 (N.Y. Sup. Ct. 1962); *Matter of Melideo,* 88 Misc. 2d 974 (N.Y. Sup. Ct. 1976). For recognition of the principle, see *Winters* v. *Miller,* 446 F.2d 65, cert. denied, 404 U.S. 985 (1971); *In re Boyd,* 403 A.2d 744, 749 (D.C. App. 1979). Where there is no occasion for State intervention in the treatment decision, "[t]he law protects [the patient's] right to make [his] own decision to accept or reject treatment, whether that decision is wise or unwise." *Candura,* 6 Mass. App. Ct. at 383.

But the case law in this area recognizes several situations in which the State may intrude on an individual's freedom to consent or not consent, as he wishes, to medical treatment, and require that his right to refuse medical treatment be weighed in the balance against various countervailing State interests. Among those occasions for consideration of State interests are: (1) where intervention is necessary to prevent the spread of communicable diseases or otherwise to protect the public health (*Jacobson* v. *Massachusetts,* 197 U.S. 11 [1905]); (2) when a minor is in need of medical care which his parents or

guardian will not provide (*Custody of a Minor*, 375 Mass. 733, 745-749 [1978]; *People ex rel. Wallace* v. *Labrenz*, 411 Ill. 618, cert. denied, 344 U.S. 824 [1952]); (3) where a patient is committed to a State institution, which has the duty to furnish him with necessaries, including medical care (the *Saikewicz* and *Myers* cases, both *supra*); (4) where the rights of innocent third parties are implicated in the treatment decision (*Holmes* v. *Silver Cross Hospital, supra*; *Application of the President & Directors of Georgetown College, Inc.*, 331 F.2d 1000, motion for reconsideration denied, 331 F.2d 1010 [D.C. Cir.], cert. denied, 377 U.S. 978 [1964]; *Raleigh Fitzkin-Paul Morgan Memorial Hosp.* v. *Anderson,* 42 N.J. 421, cert. denied, 377 U.S. 985 [1964]); (5) where necessary to effect the State policy against suicide, see the *Saikewicz* case, 373 Mass. at 743 n.11); (6) where a person submits to medical treatment but limits his consent in a manner violative of sound medical practice (*Saikewicz*, 373 Mass. at 741, 743; *United States* v. *George,* 239 F.Supp. 752, 754 [D.Conn. 1965]; contrast *In re Estate of Brooks, Erickson* v. *Dilgard,* and *Matter of Melideo,* all *supra*); and (7) where the patient is unable himself to make a legally competent treatment decision (*Saikewicz, supra*; *In re Boyd, supra* at 749-750). The present case falls, of course, within the last category, and in consequence, despite the substantial protection which the substituted judgment analysis affords to the ward's right to have his subjective needs and desires considered in making the decision whether to continue dialysis treatments, his right must be weighed against the various interests of the State in the preservation of life.

In applying the balancing test we have the assistance of the Supreme Judicial Court's recent *Myers* decision (379 Mass. 255), which involved dialysis treatments. There a prisoner in a State correctional institution, who was twenty-four years old, in good health except for kidney failure, and a good candidate for a kidney transplant which would probably cure his underlying ailment and

enable him to lead a normal life, refused the dialysis treatments which would keep him alive until that time. The refusal was not consistently maintained: he would accept treatments for a time but then, on occasion, would refuse treatment, using his refusal as leverage to influenced his placement in the prison system. The decision in that case authorized the Commissioner of Correction to consent to the administration of hemodialysis treatments over Myers' objections. The decision was put on the basis that Myers' refusals, the manner in which they were invoked and the reasons for them were a threat to the maintenance of order and discipline within the prison.[10]

The *Myers* case is pertinent for present purposes because of the court's recognition that a dialysis life-maintenance program is in its very nature sufficiently intrusive to cause an individual's wish not to receive dialysis maintenance to weigh heavily in the balance against the State's general interest in the preservation of life:

"Unlike the relatively simple and risk-free treatments of supportive oral or intravenous medications, dialysis exacts a significant price from Myers in return for saving his life. In spite of the fact that dialysis does not require the sacrifice of a limb or entail substantial pain, it is a relatively complex procedure, which requires considerable commitment and endurance from the patient who must undergo the treatment three times a week.

---

[10] Underlying the decision was a recognition that "[a]lthough the fact of the defendant's incarceration does not per se divest him of his right of privacy and interest in bodily integrity . . . it does impose limitations on those constitutional rights in terms of the State interests unique to the prison context." *Id.* at 264. A related consideration, of course, is that the State has a legal obligation to provide needed medical care to a person involuntarily committed to a State institution. *Edwards* v. *Duncan,* 355 F.2d 993, 994 (4th Cir. 1966). *Shannon* v. *Lester,* 519 F.2d 76, 79 (6th Cir. 1975).

"Taken together, the great deference accorded the State's interest in the preservation of life ... and the defendant's interest in avoiding significant, nonconsensual invasions of his bodily integrity yield a very close balance of interests." 379 Mass. at 263.

The evidence in the present case concerning the intrusiveness of dialysis is indistinguishable from that in *Myers*. The situations of the patients are notably different, in that Myers was a young man and a good candidate for a kidney transplant which could effect a permanent cure, whereas the ward's life is essentially behind him,[11] he is clearly not a suitable candidate for a transplant, and his remaining days are to be spent in an irreversible state of dementia. There are other points of comparison, but none so significant as these.[12] The several countervailing interests of the State articulated in the *Saikewicz* and *Myers* cases cannot overcome the right of private choice in the circumstances presented. The policy against suicide and the protection of innocent third parties are of no relevance. The ethics of the medical profession do not present a conflict: the doctor who is treating the ward supports the family's view that further treatment is inappropriate. The general State interest in the preservation of life − most weighty where the patient, properly treated, can return to reasonable health,

---

[11] The attending physician testified to a maximum life expectancy of five years with dialysis.

[12] There was a strong suggestion in the *Myers* case that the patient's various decisions to refuse treatment did not represent a desire to avoid treatment but rather were intended as leverage to cause the prison administration to make various concessions. Such a decision is analogous in motivation to one's threatening injury to one's own person as a means of persuasion − a practice which the State no more condones than it does the taking of one's own life for such purpose. No such improper purpose colors the imputed wish of the ward and the actual wish of his family in the present case.

without great suffering, and a decision to avoid treatment would be aberrational – carries far less weight where the patient is approaching the end of his normal life span, where his afflictions are incapacitating, and where the best that medicine can offer is an extension of suffering. Such a case presents instead the recurrent and always difficult ethical problem: To what extent should aggressive medical treatments be administered to preserve life after life itself, for reasons beyond anyone's control, has become irreversibly burdensome?

The law does not furnish an answer to that question. It leaves the answer to the person whose life is involved, if that person is competent to make the decision for himself. Where the person is incompetent, the law intervenes, not to displace the traditional role of the family and the attending physician in weighing that question, but to protect the rights of the incompetent person by determining, as best it can, what his wish would be, and ensuring that that wish is carried out if it does not violate the policy of the State or the ethics of the medical profession. If the patient is fortunate enough to have close family, as does the ward in this case, and where they and the attending physician are at one in recommending a course of treatment, or non-treatment, as that which is in the best interests of the patient and which they feel he would choose, the law should and, we think, does accord their judgment substantial weight not only in determining what course of action the patient would himself choose in the circumstances if he were able to do so, but also in determining the appropriate resolution of conflicting interests.

This view is wholly in accord with the teaching of the *Saikewicz* case, as we understand it. That case does not require that courts make all medical decisions involving incompetent persons. It does require, as matter of substantive law, that treatment decisions in cases of incompetent patients be made in accordance with what the patient would himself choose, where that choice is not in

violation of State policy or medical ethics. As matter of procedure, the *Saikewicz* holding also requires that where there is cause for uncertainty as to the course of treatment the patient would choose, typically evidenced, perhaps, by disagreement among members of the family or between them and the medical professionals as to the appropriate course of action, or where it is proposed not to employ a readily available course of treatment which could enable "a return towards a normal, functioning, integrated existence" (the *Dinnerstein* case, at 473), thereby suggesting a conflict with the usual presumption in favor of life-saving treatment (see note 5, *supra*), a court is the appropriate tribunal to resolve that uncertainty, thus at once protecting the rights of the incompetent patient and offering the attending physician or the hospital the means of avoiding potential claims of liability. The gist of the *Saikewicz* case is the protection of the right of the incompetent person to have doubtful questions concerning the appropriateness of a proposed course of medical treatment resolved in accordance with his own subjective needs and desires.[13] There is nothing in the *Saikewicz* case which casts doubt on the importance the law attaches to the role of the family or next-of-kin in evaluating the appropriateness of treatment in the circumstances of a particular case.[14] The judge did not err in giving deference to the decision of the family and the recommendation of the attending physician in the process of evaluating the countervailing State interests.

---

[13] The *Saikewicz* case may be thought of as extending to incompetent persons the substantive protection against unwanted medical treatment which is afforded to competent persons by the law of consent. See *supra*, note 5, and the *Dinnerstein* case, 6 Mass. App. Ct. at 471 n.5.

[14] The question of the role of the incompetent person's family in making decisions relative to his treatment did not arise in the *Saikewicz* and *Myers* cases. Both men were in the custody of the State, which had responsibility for furnishing medical care to them. Joseph Saikewicz had two presumedly elderly sisters who chose not to participate in any treatment decision. The *Saikewicz* case, 373 Mass. at 731. The opinion in the *Myers* case contains no mention of family.

There remains the related question of the appropriate form of judgment. As mentioned at the outset, the initial judgment took the form of a direct order that Robert Spring, acting as legal guardian, refrain from giving his consent to continued hemodialysis treatments. The second judgment declared that the attending physician, together with the ward's wife and son, were to make the determination whether to continue hemodialysis. Whatever may have been the judge's reason for the latter form of judgment, we think that on the particular facts of this case it was not substantively inappropriate, because it entrusted the power of consent to those whose views as to the appropriate course of treatment were in accordance with the substituted judgment of the ward, as determined by the court. The purpose of the court proceeding was to protect the ward's personal right to have the treatment decision made in accordance with his needs and desires, as found by the court applying substituted judgment analysis. That purpose was fully accomplished by the second judgment.

A noninjunctive form of judgment may often be desirable in terms of simple human sensitivity; injunctive relief seems unnecessarily heavy-handed where it is apparent that all participants are working towards the same goal of doing what is best for the ward and where there is no question of resistance to or disobedience of the court's determination. As a general rule, however, the judgment should be in a form which reflects that determination on its face, perhaps by designating an appropriate person to act as guardian, or temporary guardian, with authority to consent, or to withdraw consent, as the case may be, to the treatment in question. In this appeal no question is raised as to the form of judgment per se, but only as to the substance of the judgment, and, as stated earlier, the second judgment will have the substantial effect of carrying out the needs and desires of the ward and therefore need not be disturbed.

The second judgment is therefore affirmed; and we further order, because of the exigencies of the case, that any petition for rehearing or application for further appellate review be filed within ten days of the date of this opinion, in the absence of which the clerk shall forward the rescript to the Probate Court without waiting for the expiration of the time period otherwise fixed by Mass. R.A.P. 23, as amended, 367 Mass. 921 (1975).

*So ordered.*